O6KVGOOC

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   IN RE GOOGLE DIGITAL
    ADVERTISING ANTITRUST
4   LITIGATION                          21 MD 3010 (PKC)

5   ------------------------------x
                                        New York, N.Y.
6                                       June 20, 2024
                                        4:15 p.m.
7
    Before:
8
                        HON. P. KEVIN CASTEL,
9
                                        District Judge
10
                            APPEARANCES
11
    BOIES SCHILLER FLEXNER LLP
12       Attorneys for Plaintiffs
    BY:  PHILIP KOROLOGOS
13       IZAAK EARNHARDT

14  HERMAN JONES LLP
         Attorneys for Plaintiffs
15  BY:  SERINA M. VASH

16  KELLOGG HANSEN TODD FIGEL & FREDERICK PLLC
         Attorneys for Plaintiffs
17  BY:  CHRISTOPHER GOODNOW

18  AHDOOT & WOLFSON PC
         Attorneys for Plaintiffs
19  BY:  CHRISTOPHER STINER

20  FRESHFIELDS BRUCKHAUS DERINGER US LLP
         Attorneys for Defendants
21  BY:  JUSTINA SESSIONS
         SEAN MURRAY
22       VERONICA BOSCO

23  AXINN VELTROP & HARKRIDER LLP
         Attorneys for Defendants
24  BY:  CRAIG M. REISER

25

O6KVGOOC

```
1              (Case called)

2              THE DEPUTY CLERK:  For the plaintiff.

3              MR. KOROLOGOS:  Good afternoon, your Honor.

4              Phil Korologos with Boies Schiller Flexner, for the

5     publisher class.

6              THE COURT:  Good to see you, Mr. Korologos.

7              MS. VASH:  Good afternoon, your Honor.

8              Serina Vash with Herman Jones, on behalf of Inform

9     Inc.

10             THE COURT:  Good to see you.  We missed you at the

11    last conference.

12             MS. VASH:  I missed the Court, Judge.

13             MR. GOODNOW:  Hi there, your Honor.  I'm Chris Goodnow

14    with Kellogg Hansen; we represent Daily Mail and Gannett.

15             THE COURT:  Thank you.

16             MR. STINER:  Good afternoon, your Honor.

17             Chris Stiner of Ahdoot & Wolfson for the advertisers

18    class.

19             THE COURT:  Good to see you.

20             MS. SESSIONS:  Good afternoon, your Honor.

21             Justina Sessions of Freshfields, for Google.

22             I'm joined today --

23             THE COURT:  Let me say, it's good to see you.  I

24    haven't seen you in a while.

25             MS. SESSIONS:  I have not seen you in a while, your
```

O6KVGOOC

1      Honor.  It's nice to be here.

2              My colleagues Sean Murray and Veronica Bosco are

3      joining me today.

4              THE COURT:  All right.  Excellent.

5              MR. REISER:  Craig Reiser of Axinn, also for Google.

6              THE COURT:  Anyone else making an appearance?

7              MR. EARNHARDT:  Yes, your Honor.

8              Izaak Earnhardt, Boies Schiller Flexner, for the

9      publisher class.

10             THE COURT:  Thank you.

11             All right.  We have nine days to the end of fact

12     discovery.  I've been trying to keep up with my rulings.  When

13     I got the latest round, I thought it was more efficient to do

14     this by having you in today.

15             Let me begin with the 30(b)(6) depositions.  And let

16     me point out some of the considerations.

17             The Court should consider whether the topics are

18     proportional to the needs of case, not unduly burdensome or

19     duplicative, and described with reasonable particularity.  And

20     the reasonable particularity requirement requires the noticing

21     party to describe the relevant subject areas with painstaking

22     specificity.  Where the topics are vaguely worded, seek

23     irrelevant information, or are so overly broad as to make it

24     impossible for the responding party to prepare its witness, the

25     Court may strike the topics.

1          And as Judge Netburn has pointed out, a Rule 30(b)(6)

2    deposition should not be a memory contest of topics better

3    suited to a written response or a supplemental document

4    production.  The Court should strike notice topics that would

5    result in a witness merely testifying to information readily

6    available through document production.

7          So let me start off by hearing from Google.

8          Google has sought a protective order from this Court.

9          What exactly are you seeking me to do and why?

10         MS. SESSIONS:  Thank you, your Honor.

11         So we have moved for a protective order on the entire

12    30(b)(6) notice, your Honor, and would ask that the entire

13    notice be quashed.  However, I will note we did make an offer

14    to the plaintiffs to provide some 30(b)(6) testimony in

15    response to certain topics in the offer, and we're willing --

16    in the notice, and we're willing to stand by that offer.

17         THE COURT:  Let me have you give me something of a

18    chronology.  The notice was served in May 10 or so?

19         MS. SESSIONS:  The notice was originally served -- I

20    don't think I have the actual notice -- May 10th?  May 10th,

21    yes, your Honor.

22         THE COURT:  Okay.

23         MS. SESSIONS:  And then we had a meet-and-confer.

24         THE COURT:  When was that?

25         MS. SESSIONS:  On May 29th we had a meet-and-confer on

the notice.  At that meet-and-confer, we asked the plaintiffs

to identify priorities from that very broad notice.  Plaintiffs

identified 61 out of their 85 topics as supposed priorities.

And then also as a part of that meet-and-confer, claimed that

certain topics sought testimony on concepts that were not even

included in the topics listed in the notice.

        We then exchanged written correspondence and, on

June 7th, Google made an offer to designate witnesses.  We said

we would designate witnesses to testify for a total of ten

hours to be divided among the plaintiffs as they saw fit, as

long as no one witness was going to be compelled to sit for

more than seven hours.

        And we agreed to designate witnesses on, first of all,

various topics relating to Google AdSense, which was one of the

products at issue in this case but that had not been the focus

of significant deposition testimony previously.  So we felt

that it would be reasonable to provide 30(b)(6) testimony on

the AdSense topic, since the depositions taken so far had not

really focused on that topic nor had plaintiffs sort of been

able to ask a witness questions on those topics.

        We also offered to designate a witness to testify

regarding one of the topics specific to Inform, which relates

to the transition from the flash video format to the HTML5

video format, which is the unique aspect of Inform's case that

does not really relate to the other AdTech antitrust products

1    and allegations.

2         And then finally, we said that we would provide two

3    technical product witnesses to answer -- who have previously

4    been deposed multiple times; but we would provide their answers

5    to questions that they had been asked in their depositions that

6    they did not know the answers to.  So where there were

7    technical questions that those witnesses were asked, but they

8    didn't know, we would educate them to be able to answer those

9    technical questions.

10        THE COURT:  This is throughout the discovery period;

11   in other words, it's not limited to one subject area?

12        MS. SESSIONS:  This would be -- so these are two

13   witnesses, one of them has been -- is sort of our person most

14   knowledgeable on what we call the sell side products, the ad

15   server or the AdExchange that are accused in this case; and

16   then one witness works on what we call the buy side products,

17   those that work on bidding on behalf of advertisers.

18        And so we said if you had asked one of -- if you asked

19   one of those witnesses sort of a question within the scope of

20   your 30(b)(6) notice now that they didn't know the answer to

21   sitting in their personal capacity, we would provide you the

22   answers to those questions as a part of this 30(b)(6) response.

23        THE COURT:  So these are two individuals, two specific

24   individuals, each of whom were deposed.  And in certain

25   instances, each of them said, Gee, I don't really know the

1   answer to that question.

2              MS. SESSIONS:  That's correct.  There were a few

3   instances in which they were asked sort of in-scope technical

4   questions that they didn't know the answers to as fact

5   witnesses.  And so we offered to go get the answers to those

6   questions and provide those.

7              THE COURT:  All right.  Go ahead.

8              MS. SESSIONS:  And as I understand it, the plaintiffs

9   rejected this offer.  And then they served an amended notice

10  that eliminates certain topics, but still has 38 listed topics

11  that consists of nearly 200 discrete subparts across the

12  notice.  And that is the notice on which they moved to compel

13  testimony and for which we are seeking a protective order.

14             THE COURT:  Okay.

15             All right.  Let me leave it at that for the moment and

16  hear from the plaintiffs.

17             Mr. Korologos, you'll have to forgive me, I have a few

18  questions.  You kind of might have imagined that was going to

19  happen.

20             MR. KOROLOGOS:  I did, your Honor.

21             THE COURT:  So I've looked at the 38 topics.  This is,

22  I think, the one that was served on June 13th, the amended

23  notice.  Thirty-eight topics; 200 discrete areas.

24             How long would this 30(b)(6) deposition take, in your

25  opinion?  And what happens when you get to the ten-hour or

1  seven-hour limit?  What happens then?

2          MR. KOROLOGOS:  Well, your Honor --

3          THE COURT:  Are you going to do them in the order in

4  the notice, and then when the time runs out, go home?

5          MR. KOROLOGOS:  Two points, your Honor.

6          First of all, the federal rules will, at least in

7  part, determine what the length is.  Because the rules, as

8  noted by the committee, said that for a 30(b)(6) deposition,

9  seven hours applies to each designee.  They put up one

10  designee, seven hours; two, 14.

11          What we proposed is 21 hours as a cap for all of these

12  topics.  That's it.  However many designees.  If they put up 21

13  people, we get, on average, an hour with each.  That's what our

14  proposal is.  We can do that.

15          Yes, there are 200 subparts or thereabouts.  But if

16  your Honor looks at those, that's because we're giving the

17  detail to allow Google to understand how they need to prepare

18  the witness so that we don't get the answers that say "I don't

19  know."

20          THE COURT:  And then I suppose if time runs out or the

21  witness gives an abbreviated summary answer, then you're going

22  to move to preclude the trial testimony, right?

23          MR. KOROLOGOS:  Well --

24          THE COURT:  Yes.

25          MR. KOROLOGOS:  I don't think if time runs out I get

1    an opportunity to preclude testimony if I haven't asked the

2    question.  If I've asked a question and I get an answer, I

3    don't think they can give a different answer at trial.  But I

4    have to ask the question.

5         THE COURT:  Let's take number 14.  Concerning the

6    functions you provided to publishers displaying advertisements

7    through AdSense over time, including the margins, take rates,

8    percentage fees, flat fees, or any other charge that you levied

9    for functions performed by AdSense, GDN, AdExchange, DB 360, or

10   the authorized buyer's program, including any functions

11   performed at the Cat 2 Mixer, Super Mixer, and/or Cat 2 Super

12   Mixer in the process of displaying an advertisement through

13   AdSense following topics:

14        The prices you charge for these functions, the factors

15   you considered in setting those prices for these functions, any

16   analysis you conducted for the purpose of deciding whether to

17   change the prices you charge for any and oral of these

18   functions, or change the pricing structure, including the

19   margins, take rates, percentage fees, flat fees, and/or whether

20   to charge based on cost per clip, cost per mile, and/or cost

21   per action.  And the costs you incurred in providing AdSense's

22   services to publishers over time, including any computing costs

23   and any variable, fixed, or semi-fixed operating costs you

24   incurred to display an advertisement through AdSense, the

25   extent to which such costs are associated with operating the

O6KVGOOC

1    infrastructure of AdSense, GDN, AdEx, or any other Google

2    AdTech product and how much -- how such costs related to the

3    prices you charged.

4            Now, that is one of the 38 topics; correct?

5            MR. KOROLOGOS:  It is.  But that's an easy one.

6            THE COURT:  Okay.  We'll get to the hard ones.  I

7    wanted to start you off, Mr. Korologos, I wanted to give you a

8    nice softball, you can hit it out the park.  What's the time

9    period?

10           MR. KOROLOGOS:  The time period for that --

11           THE COURT:  You say "over time."  Over what time?

12           MR. KOROLOGOS:  Well, your Honor, I think we -- let me

13   first indicate that that's already been agreed to.  Topics 12,

14   13, 14, 15, and 16 are set for a deposition next Friday --

15           THE COURT:  That's great.

16           MR. KOROLOGOS:  -- in London for three and a half

17   hours.  And as to the time period, we would go with our

18   relevant time period, your Honor, which is defined in

19   instruction or definition 30, January 1, 2010 to the present.

20           THE COURT:  Okay.  Now, this witness is to be prepared

21   by the client; correct?

22           MR. KOROLOGOS:  Yes, by Google.  Yes, your Honor.

23           THE COURT:  Or by Google's lawyers.  Okay.

24           And to come to the deposition, they don't have a right

25   to consult notes during a deposition; correct?  You could be a

1  sport and say, I'll let you, but they don't have a right to

2  consult notes in the middle of a deposition.

3           MR. KOROLOGOS:  I'm not sure there's anything that

4  prohibits that, your Honor.

5           THE COURT:  Oh, okay.

6           So how about in a fact deposition?

7           MR. KOROLOGOS:  Pardon me?

8           THE COURT:  How about in a fact deposition?  A 30(b)

9  one deposition?

10          MR. KOROLOGOS:  That would be rare, your Honor.

11          THE COURT:  Rare.  Nothing prohibits that?

12          MR. KOROLOGOS:  Well, a witness needs to testify as to

13  their personal knowledge.  I can imagine certain exceptions to

14  the standard approach of not consulting things during a pending

15  question.  But for 30(b)(6), I've been in many depositions

16  where witnesses have arrived with explanatory materials.

17          THE COURT:  I'll bet.  But that's not something that's

18  provided for in the rules.  That's a backdoor interrogatory;

19  that's an interrogatory essentially.

20          All right.  What's the next subdivision?  Well, okay,

21  let's go for the period, what is it?  You start with 2010?

22  2010 to 2015.  This was this as to that, such and so.  And now,

23  excuse me a moment, let me look here.  From 2015 to 2020, as to

24  this, etc.

25          This sounds to me exactly what Judge Netburn was

1    talking about as to a memory test.  And as she wrote:  A Rule

2    30(b)(6) deposition should not be a memory contest of topics

3    better suited to written response or a supplemental document

4    production.  A court should strike notice topics that would

5    result in a witness merely testifying to information readily

6    available through document production.

7           Now, you told me I picked an easy one.  So tell me

8    what's happening next week.

9           MR. KOROLOGOS:  There's a deposition scheduled.  The

10   witness is in London.

11          THE COURT:  One witness?

12          MR. KOROLOGOS:  That's our understanding.  For three

13   and a half hours on topics 12, 13, 14, 15, and 16, relating to

14   AdSense.  And that's what Ms. Sessions just talked about of the

15   AdSense topics that they were willing to produce a witness on.

16          And the follow-up, your Honor, with respect to

17   pricing.  Given the nature of the way Google runs its business,

18   this is not like going to the supermarket and saying, How much

19   did you charge for oranges back a year ago?

20          Take, for instance, AdEx --

21          THE COURT:  I get that.  That would be easy to testify

22   to.  I guess you could learn that and come in and testify.

23          MR. KOROLOGOS:  Take, for instance, AdEx, your Honor.

24   They charge a 20 percent margin constantly.  And still they

25   decided to lower it just a little bit for certain transactions

1  to try to gain more market share.  Then what did they do?  They

2  then increased it for some transactions to get their average

3  back to 20.

4            THE COURT:  And that's going to be potent evidence at

5  trial, isn't it?

6            MR. KOROLOGOS:  It will be, your Honor.

7            THE COURT:  I'm sure it will.  But you don't need a

8  deposition for that.

9            MR. KOROLOGOS:  I believe we're entitled to examine

10  it, particularly, your Honor, for the factors that they

11  considered in pursuing that.  We'd like to know why they took

12  that approach and what their arguments are going to be at trial

13  that try to justify that approach.

14            THE COURT:  Ms. Sessions, I'll give you an opportunity

15  a little later.  I'm going to continue with Mr. Korologos.

16            Sorry.

17            But I don't see a question here that, Hey, I want to

18  take your deposition and ask you the factors that go into

19  setting the rate of margin.  If that's what you were seeking

20  from a 30(b)(6) witness, we might not have needed this hearing

21  today.  Oh, it may be somewhere included; you could parse

22  through one of your 38 categories and find that embedded in it,

23  but that plus a lot more.

24            MR. KOROLOGOS:  Well, I think it's covered, your

25  Honor, by 14B, the factors you considered in setting those

1    prices.

2                    THE COURT:  But my point is 14B covers from 2010 to

3    the present, a 14-year period.  And it doesn't end there,

4    right?  That's not all you're asking for.  I read 14.  That's

5    the one I read.  There's a lot more to it.  So why not go into

6    a room -- I understand you've already come to an agreement with

7    regard to 12, 13, 14, 15, and I'm not going to upset that

8    agreement.  But --

9                    MR. KOROLOGOS:  16 as well, your Honor.

10                   THE COURT:  And 16.

11                   Did you take any depositions in which you question

12   witnesses on dynamic allocation and enhanced dynamic

13   allocation?

14                   MR. KOROLOGOS:  We have talked with some fact

15   witnesses on those topics, your Honor.

16                   THE COURT:  All right.

17                   MR. KOROLOGOS:  And on some of those topics, we have

18   asked them questions and received nonanswers.  Those are among

19   the topics that Ms. Sessions identified that they were willing

20   to produce witnesses on.

21                   Now, one of the things that I think is telling, your

22   Honor, in the two exhibits we have at the end of our June 14

23   submission, we have their June 7 letter which says that they --

24   this is on page 3 of their June 7 letter.  They say they will

25   designate a witness or witnesses to testify regarding

1    previously posed -- questions previously posed to Mr. Korula

2    and Ms. Jayaram in this litigation and for which they did not

3    have an answer on buy and sell-side topics.

4           Then it goes on and identifies a number of topics that

5    they will produce the witness on, including the operation, the

6    design, expected benefits of dynamic allocation, enhanced

7    dynamic allocation, and several other topics.  That's contrary

8    to the position that they say in their motion for a protective

9    order that they can't understand how to produce somebody on

10   that.  That's what they've offered to do.

11          Now, a few days later, they come back and say, Well,

12   what we really mean — and this is the June 12 letter.  What

13   they really mean is we're going to produce Jayaram and Korula

14   on ten questions that were not answered at the deposition.  But

15   it's very different, your Honor, as your Honor knows, taking a

16   deposition of a fact witness where the witness can truthfully

17   say "I don't know," versus taking the deposition of a

18   corporation through 30(b)(6) where that's not an appropriate

19   answer to a question within the scope.

20          So when the witness has exhausted their knowledge in a

21   fact deposition, you're going to move on to other topics.  That

22   would not happen.  And so limiting it to just giving us the

23   answers to those ten questions doesn't get us the deposition

24   that we're entitled to.

25          THE COURT:  Mr. Korologos, what you're saying has a

reasonable component to it.  I understand the ways of the

world.  I understand why there was a notice served with 300

topics -- I'm sorry, 38 topics, 200 discrete categories, if you

totalled them all up within the 38 topics.  I'm accepting that

number at face value.  You may have a different number.

Okay.  You got the ball rolling and you had

discussions.  If Google comes back to you and says, Aha, we,

Google, found ten answers that the witness said "I don't know,"

"I don't recall," "I don't understand," and we'll give you that

witness for those ten questions, and that was it, and they dug

in after that, I would understand the point.

But there is a reason for the meet-and-confer

requirement.  You may say, legitimately — I suspect you might —

No, it's not ten questions that you, Google, picked.  I have 30

questions that I can see where the witness claimed "I don't

know," "I don't recall."  No other witness had testimony to

give on the subject, and I now need.

That takes hard work, hard work to sit down and

negotiate it.

The alternative is to dump it in my lap and have me do

what I have done in this case before:  Go through the 38

topics, go through the 200 discrete categories.  Have you give

it to me in Microsoft Word format; have the defendant do the

same.  And then I'll issue an order.

But dumping it in my lap is not the way this is

1  supposed to work.

2      It seems to me that you have some points that should

3  be traded across the table not next week, but this afternoon —

4  yes, this afternoon.  It's probably the longest day of the

5  year; you'll have plenty of daylight to work in — and when the

6  sun rises tomorrow morning.  And work it out with Google.

7      Is Google prepared to sit down and hammer it out?  And

8  if the plaintiffs have other areas in addition to the ten which

9  I guess you've self-identified, will you consider producing?

10      MS. SESSIONS:  Yes, your Honor.

11      So with the understanding that -- what we were trying

12  to do with this offer and with the identification of those ten

13  questions was I recognize there were some things that they

14  couldn't get an answer to out of Mr. Korula and Mr. Jayaram who

15  were, in fact, our 30(b)(6) witnesses in the DOJ case on these

16  topics.  So if they identified another specific question of

17  those types that they need an answer to, we would be happy to

18  discuss that with them.

19      But the "why did you take the approach that you did

20  for reserve price optimization," that and all of those

21  subtopics, they took the depositions of the people that

22  developed reserve price optimization already and they asked

23  those questions.  So it seems completely unnecessary to retread

24  all of that in a 30(b)(6) notice.

25      But to answer your question, your Honor, we're

O6KVGOOC

1    certainly willing to sit down and discuss an additional set of

2    discrete questions to which they want answers and have been

3    unable to obtain them thus far.

4              THE COURT:  But I think there's a trap door in your

5    answer.  There may be more than one trap door, but one that hit

6    me is you're limiting this to a prior 30(b)(6) deponent in the

7    DOJ case.

8              MS. SESSIONS:  Oh, sorry, your Honor, that was not my

9    intention.  My point was that Mr. Korula, Mr. Jayaram, who they

10   have already deposed, were also our 30(b)(6) witnesses on the

11   technical topics in the DOJ case.  My point being these are not

12   random people who would only be expected to know just a little

13   bit about these technical topics.  They are deeply

14   knowledgeable and were, in fact, able to answer most of the

15   questions posed to them.  So my point is only that it should be

16   a limited universe of technical questions that remain

17   unanswered at this point.

18             MR. KOROLOGOS:  Your Honor, we're happy to sit down

19   with Google and negotiate further.  I would say it is certainly

20   not our intent to dump this in your lap.  We started with 81

21   topics.  We then went to 65.  We then got down to 38.

22             THE COURT:  You're going in the right direction.

23             MR. KOROLOGOS:  I get that, your Honor.  We will

24   narrow it more --

25             THE COURT:  You're not seeking an extension of the

O6KVGOOC

1    discovery period, are you?

2              MR. KOROLOGOS:  We are not, your Honor.

3              THE COURT:  Okay.

4              MR. KOROLOGOS:  We will narrow it more.  We have a

5    regularly scheduled call with Google every Friday at 10 a.m.

6    If we can't get it done between now and 10 a.m., we'll make

7    sure that it's on the schedule for 10 a.m. tomorrow.

8              THE COURT:  That may be a long call.

9              MR. KOROLOGOS:  It may be.

10             THE COURT:  All right.  And what I'm going to do is

11   I'm going to have you get for me for Monday your amended

12   30(b)(6) notice in Microsoft Word format, and the same for

13   Google, and I'll do what I do.  And as is typical, you'll both

14   be unhappy.

15             MR. KOROLOGOS:  We will submit ours on Monday, your

16   Honor.

17             MS. SESSIONS:  Understood, your Honor.

18             THE COURT:  All right.

19             Okay.  Now, the depositions were kind of the easy

20   topic.

21             Before I depart depositions, let me hear from Inform.

22             As I understand this, Inform is concerned because the

23   document production has not included direct communications

24   between Inform and Google personnel; is that correct, Ms. Vash?

25             MS. VASH:  That's correct, Judge.

O6KVGOOC

1          THE COURT:  All right.

2          And Google comes back and says -- I don't know whether

3     this is a big lie or the truth, that I think it's prior to

4     2017, they don't have the documents anymore.  Is that what

5     they've said?

6          MS. VASH:  That's what they most recently said, yes.

7          THE COURT:  All right.  So what do you do about that?

8     Do we apply torture to get them to confess that they're lying

9     or what do we do?

10         MS. VASH:  We had simply wanted a clear and concise

11    understanding of what their document retention policy was.  We

12    asked when they had issued litigation hold letters with respect

13    to our case and our client.  We filed this case in November 25,

14    2019, and wanted to be assured that a litigation hold was

15    placed on the relevant people back at that time so that all of

16    those communications would be preserved.

17         And Judge, we raised that back then,

18    November/December 2019, with counsel Jonathan Schmidtlein and

19    Eric Schroeder, who were representing Google in the Northern

20    District of Georgia.  We just wanted to ensure that, in fact,

21    the litigation hold letters were there and the documents were,

22    in fact, preserved.

23         The answers we got were less than straightforward.  I

24    didn't get -- I tried to get it from the witness that I deposed

25    a few weeks ago.  You know, What is your document retention

1    policy?  And I got "I don't understand what you mean by

2    'document retention policy.'"

3              THE COURT:  All right.  Let's see how I do.

4              MS. VASH:  Okay.  Thank you, Judge.

5              THE COURT:  Ms. Sessions, those are the questions.

6              And the answers are?

7              MS. SESSIONS:  Your Honor, certain witnesses that we

8    understood to be potentially relevant to the *Inform* case were

9    placed on a document hold shortly after Inform's complaint was

10   filed in 2019.  However --

11             THE COURT:  "Shortly after" means?

12             MS. SESSIONS:  I am not clear on exactly the date that

13   the hold went out.

14             THE COURT:  Six months?  Three weeks?  One month?  Two

15   weeks?

16             MS. SESSIONS:  I am -- it was less than six months,

17   your Honor, but I'm not -- I'm not -- I don't have the dates --

18             THE COURT:  You can provide that easily.

19             MS. SESSIONS:  We certainly could, your Honor.

20             THE COURT:  And that has not been provided to Inform

21   thus far?

22             MS. SESSIONS:  So, your Honor, we have not provided

23   the precise dates on which particular people were placed on

24   hold.  Your Honor, our decision to place particular people on

25   hold reflects attorney work product and our assessment of the

1  case at the time it was filed.  However, I can make the

2  representation that certain of the custodians that Inform asked

3  us to search documents for were placed on hold at some point

4  within a reasonable time after the complaint was filed.

5          However, that was --

6          THE COURT:  Now, I'm ordering you to produce that.

7  Time is short.  I'm ordering you to produce the identity of the

8  people as to whom the litigation hold was put in place and when

9  it was put in place.

10          Now, I think there was a "but" coming or a qualifier

11  coming, and let me have you put that on the record.

12          MS. SESSIONS:  Oh, your Honor, there was no qualifier

13  as to the litigation hold.  My point was it is not surprising

14  that for a case that was filed in November of 2019, that there

15  no longer exist emails from many, many years before that

16  because those could have been -- those may have been deleted

17  pursuant to a normal document retention policy because those

18  people were not on hold for the purposes of this case.  So it's

19  unsurprising that when we did the document searches for this

20  case, that those didn't come up with emails from 2014 or many,

21  many years before Inform decided to file its case.

22          We have produced a significant number of documents

23  from those custodians from later dates.  But these direct

24  communications that they are talking about simply did not exist

25  in the files that we had.

O6KVGOOC

1          THE COURT:  So you're going to provide your document

2     retention policy dates for documents that fall within the scope

3     of Inform's discovery requests.  So I assume their discovery

4     requests don't include leases.  And leases or deeds to real

5     estate may have a 40-year hold on them, but they do have

6     categories of business communications.  And you're going to

7     provide the length of that retention policy.

8          MS. SESSIONS:  Which we have already provided to

9     Ms. Vash, but we will be happy to provide that again.

10          I understand this dispute relates only to emails or

11     direct communications, and we've provided that default

12     retention policy to Ms. Vash.  And we will be happy to provide

13     the dates on which the Inform custodians were placed on

14     litigation hold.

15          THE COURT:  Okay.

16          And that's by Tuesday next week.  Thank you.

17          Ms. Vash?

18          MS. VASH:  Thank you, your Honor.

19          There were many email communications during that time

20     frame.  So I don't know if your Honor has ordered the retention

21     policy itself.

22          THE COURT:  No.

23          MS. VASH:  You have not.

24          THE COURT:  I have not.

25          But it's incumbent on Google to review its policy,

1  review your document request, and provide you with the length

2  of retention that relates to the requested material.  That's

3  why I use the absurd example of a mortgage or a deed or a

4  lease.  I assume you haven't asked for any of that.  Why would

5  you?  And so, therefore, you don't need to know what their

6  retention policy is for that.  However, you do need to know

7  what the retention policy is for business communications with a

8  customer, vendor, competitor, or the like, right?

9          MS. VASH:  Exactly.  Thank you, your Honor.

10          THE COURT:  Okay.  All right.  Thank you.

11          Now, let's talk about requests to admit.

12          I think I have, is it, 1400 pages or so of exhibits?

13  I just pull Exhibit F, and it doesn't look so bad because it's

14  double-side printed, but it's 274 pages.

15          Who can honestly say they've tried a case — tried a

16  case — in which they or their adversary offered a response to a

17  request to admit into evidence?

18          Okay.  I'm noticing all the hands that are up so far,

19  it's none.  But the point is they are of limited use.

20          And let me give you the black letter on RFPs –– RFAs,

21  rather.  Well, I may not have brought it with me, but from

22  recollection, they are subject to proportionality

23  considerations.  They are subject to objections based on

24  burdensomeness and other Rule 26 factors as well.  And it looks

25  to me that it might not be humanly possible to respond to the

O6KVGOOC

1     requests for admission.

2             Let me ask counsel for Google, how many requests for

3     admissions have been served on you in the MDL cases?

4             MS. SESSIONS:  I think my colleague has the grand

5     total.  It's 9,700.

6             THE COURT:  Okay.  And that's not just the document

7     ones, or is that just the document ones?  Because I thought it

8     was 9700 might have been the document ones, and there were

9     3,700 nondocument ones.  But I'm doing this --

10             MS. SESSIONS:  That's correct.  Sorry.

11             THE COURT:  -- by memory, so I could be way off.

12             MS. SESSIONS:  No, you are correct, your Honor.

13             So the 9,700 is what plaintiffs had called

14     admissibility or document-related ones.  And then we have an

15     additional set of fact ones, which is another 450.

16             THE COURT:  All right.

17             So let's talk about the admissibility ones.

18             One of the things that is going to go on in this case

19     is there is going to be a joint pretrial order, a joint

20     pretrial order actually for each constituent case in the MDL,

21     each of them is going to need a joint pretrial order.  And

22     there can be joint negotiation.  But that joint pretrial order

23     is going to have a heavy stipulation of facts.  There are a lot

24     of facts that I know the parties can stipulate to.  And it will

25     make the trial of this action much easier.

O6KVGOOC

1          The other circumstance in connection with the joint

2    pretrial order is that everybody will list their trial

3    exhibits, and the parties will indicate whether or not they

4    have an authenticity objection, a substantive objection like

5    hearsay or not a business record.  And it seems to me that --

6    first of all, are the plaintiffs saying they plan to offer 9700

7    exhibits at trial?  Is that the position of the plaintiffs?

8    That's what's going to happen with the jury, they are going to

9    get 97 --

10          MR. KOROLOGOS:  No, your Honor.

11          THE COURT:  Okay.  All right.

12          So what needs to be done with regard to the 9700 is —

13    and I will give you time on this — to determine what you want

14    to use as trial exhibits as the case exists today.

15          Now, I understand the defendant says they are going to

16    move for summary judgment and it will be -- there will be no

17    documents in the stack or very few.  You, on the other hand,

18    with the competence you're entitled to in representing your

19    client, believe that it will be all claims will survive.

20          But come up with your exhibits for trial.  You don't

21    have to do it by June 29th.  You're going to come up with a

22    list, and you're going to have an agreed-upon format.  You can

23    use the model used for most joint pretrial orders in which it

24    asks whether the other side has an objection and what it's

25    based on:  Authenticity, not a business record, hearsay, or

1    other, please specify.  And it's a two-way street.  Google will

2    have to do this and submit it to the plaintiffs.  And that way

3    you will know what you need.

4         You will say, These people are objecting on

5    authenticity to documents that were produced out of their own

6    files.  And if that's the case, so be it, maybe we're going to

7    go for sanctions, but we now know we need a document custodian

8    witness at trial for that.  And you're going to get your

9    document custodian witness.  Same way for Google.

10        Now, I'll give you -- this is a true act of

11   generosity.  But I'm going to give you the opportunity to work

12   out a schedule on doing this, at least a proposed one; doesn't

13   mean I'm going to buy it, but to propose one.  And to propose a

14   methodology on this.  And as I say, it can be after -- it will

15   be after June 29th.

16        And that takes care, in my view, of 9,700 RFAs.

17        MR. KOROLOGOS:  We'll do that, your Honor.

18        MS. SESSIONS:  Yes, your Honor.

19        THE COURT:  Okay.

20        Now, you got me down to how many, 400?

21        MR. KOROLOGOS:  450.

22        MS. SESSIONS:  450.

23        THE COURT:  450.  Okay.

24        Now, let me hear Google first, then I'll hear the

25   plaintiffs.  What's the matter with the 450?

1          MS. SESSIONS:  Well, again, your Honor, as you noted

2     at the outset, RFAs are subject to Rule 26 limits on burden and

3     proportionality.  And 450 requests to admit various facts

4     served at the end of fact discovery with just -- while we're

5     trying to do everything else to get fact discovery closed in

6     this case is grossly disproportionate.

7          Now, we again proposed to plaintiffs, Why don't you

8     get together.  And if there are some things that you don't

9     think you have a straight answer on — again, it's not in our

10    answers, it's not in our interrogatory responses, it's not in

11    the other discovery that you've taken — serve 40 fact RFAs and

12    we'll answer 40 of them.  But 450 is not a winnowed list; it's

13    not a list of things that are really important or that they

14    need and it's, frankly, make-work at this stage of the case.

15         THE COURT:  Okay.

16         Mr. Korologos.

17         MR. KOROLOGOS:  Your Honor, one thing to remember

18    about RFAs is they are only usable in the particular case, and

19    that's one of the reasons why there are 450.

20         The publisher plaintiffs' list is 203, I believe it

21    is, your Honor, on the fact side.  But to limit the four

22    plaintiffs groups to ten RFAs is substantially less than is

23    appropriate to try to move this case along and resolve the

24    facts.

25         Your Honor asked has anybody submitted an RFA into

O6KVGOOC

1    evidence.  I have not; but have used RFAs a number of times in

2    summary judgment briefing and to develop the stipulated facts

3    that go into the pretrial order and are described to the jury.

4    So that's where I think they are useful and that's why we are

5    trying to narrow them -- narrow the issues that need to be

6    tried.

7                If your Honor looks at Exhibit I --

8                THE COURT:  By the way, I don't mean to interrupt you,

9    but you are -- everybody in this room is highly experienced.

10   And think back to all the summary judgment motions you've

11   worked on over the course of your career.  And think to those

12   56.1 and 56.2 statements.  And, oh, yeah, oh, yeah, you'll get,

13   It's a Delaware corporation.  Admitted.  Admitted.

14               What else is admitted in the 300 56.1 statement

15   points?

16               MR. KOROLOGOS:  Not very much, your Honor.

17               THE COURT:  Not very much.

18               And that's what happens with requests to admit.

19               Now, what I'm prepared to say is let's go through the

20   groupings of plaintiffs.  There is the publishers' class

21   actions.

22               MR. KOROLOGOS:  Yes, your Honor.

23               THE COURT:  There is Gannett and Daily Mail.

24               MR. KOROLOGOS:  Right.

25               MR. GOODNOW:  That's correct, your Honor.

```
 1            THE COURT:  There's Inform.

 2            MS. VASH:  Yes, Judge.

 3            THE COURT:  There's the advertisers' class action.

 4            MR. STINER:  Yes, your Honor.

 5            THE COURT:  And what am I omitting?

 6            MR. KOROLOGOS:  You've got them all.

 7            THE COURT:  Okay.

 8            Now, I have a question for Google.

 9            Mr. Korologos raised a point which I hadn't thought

10   about, but it's a very important point.  And I believe him to

11   have said to me — and I think he's right — that a request to

12   admit -- a response to a request to admit is only usable in the

13   action in which it is posed, all right.

14            Do you agree with that proposition?

15            MS. SESSIONS:  I do agree with that proposition.  But

16   I have a potential solution.

17            THE COURT:  That's where I'm headed too.  And I think

18   our potential solutions may be similar in appearance.

19            You will agree that the responses to the request to

20   admit in -- served in the action, these four actions, will be

21   usable in any of the four actions; is that correct?  Is that

22   your solution?

23            MS. SESSIONS:  So my solution would -- that is what we

24   contemplated when we proposed the 40, was that the 40 would be

25   usable across the actions.
```

1          So I think the answer to your Honor's question is yes,

2     provided that there is a reasonable cap on the number of

3     requests for admission.

4          THE COURT:  Understood.  Understood.  Understood.

5          Okay.  I'm going to cap them.  And I'm capping them

6     collectively at a total of 80.  Pick your 80 best ones and go

7     with it.

8          MR. KOROLOGOS:  Thank you, your Honor.

9          THE COURT:  Okay.  Now --

10          MS. SESSIONS:  I'm sorry, your Honor, just one point

11     of clarification.

12          THE COURT:  Yes.

13          MS. SESSIONS:  I think they'll pick their 80.  And

14     notwithstanding the fact discovery deadline, I assume we would

15     have 30 days to respond after the 80 are served.

16          THE COURT:  No, I'm not extending the fact discovery

17     deadline.  I've cut it back.  And you're going to have to work.

18          I will give you -- what I can do for you is I will

19     give you -- the discovery cutoff is not being extended, but I

20     will give you 14 days beyond the discovery cutoff to get your

21     answers in, assuming — this assumes — you get the 80 by 5 p.m.

22     on Monday.

23          MS. SESSIONS:  Thank you, your Honor.

24          THE COURT:  All right.

25          I hesitate to do this, but what else?  Go ahead.

1        MS. VASH:  Thank you, your Honor.

2        On behalf of plaintiff Inform, we raised three issues

3    in our June 14th letter to the Court.  The one was already

4    addressed by the Court, and we appreciate that.

5        The other two were as respects the production of a

6    data set that is relevant to plaintiff Inform, and the request

7    following receipt of the majority of the Inform-specific

8    documents, and the understanding that there are really no

9    direct communications, the request to depose a witness who had

10   previously been identified in the MDL group's request for

11   depositions.  So those --

12       THE COURT:  Tell me about the witness and why -- one

13   of the things I understand, there's a back and forth.  The

14   assertion is that you've known about this person since

15   August 2023.  Tell me about the "why now" and "why not sooner"

16   as to this witness.

17       MS. VASH:  Well, as respects this witness, this is the

18   person who introduced our client to Google.  And "why now" is

19   because of the documents that were just produced in the last

20   week or two.

21       THE COURT:  Okay.

22       MS. VASH:  And those documents indicate -- I probably

23   shouldn't say too much on the record, but they very much

24   support our theory.

25       THE COURT:  Okay.

1          MS. VASH:  And they are definitely going to be front

2     and center at our trial.

3          And I believe that your Honor said in one of our first

4     meetings that you think many cases — forgive me if I misstate —

5     come down to ten, ten documents.

6          THE COURT:  That's what I did say.

7          MS. VASH:  Well, I've got two of them here, Judge.

8     And this is the witness.

9          THE COURT:  Okay.

10          Now, with regard to -- I'm going to give Google an

11     opportunity to respond on this, but let me just ask you about

12     the transaction level data.

13          They maintain that no transaction level data of the

14     sort are maintained in the ordinary course of their business;

15     that they have repeatedly explained this to Inform; and that

16     they believe that the issue had been put to rest based on its

17     recent meet-and-confer.

18          You want me to order them?  How many transactions do

19     you think your request covers?  And give me like a round number

20     estimate.  1,000?  100,000?  A million?

21          MS. VASH:  It's more than that, Judge.

22          THE COURT:  More than a million.

23          MS. VASH:  We were looking for a similar slice of --

24          THE COURT:  How much more than a million?

25          MS. VASH:  One week's worth of transactions for our

1   client alone.

2              THE COURT:  You're seeking one week.

3              MS. VASH:  One week.

4              THE COURT:  Okay.  So how much would that be?  I mean,

5   roughly.  I mean, round numbers.

6              MS. VASH:  I would think several million impressions.

7              THE COURT:  Okay.  For just one week.

8              MS. VASH:  Yes, sir.

9              THE COURT:  All right.

10             Now, Google says — and again, as I prepare to believe

11  if it's true and disbelieve if it's not true.  But they say

12  they don't keep such information in the ordinary course of

13  business and this would be an exercise of putting together such

14  data.

15             MS. VASH:  Judge, when we were working with Google, we

16  had an agreement whereby we were paying for that data.  So they

17  should have kept it.  In connection with my client, they

18  should, in fact, have kept that data in the ordinary course of

19  business.  And so it's not really -- it wouldn't be going and

20  reaching out into the ether; it should be something that

21  they've already collected and they already have.

22             THE COURT:  Okay.  So you're looking for something

23  they already have.  And what week are you looking for?

24             MS. VASH:  I am looking for a week in and around 2014.

25  And I would give your Honor and I would give Google the exact

1    week following this conference.

2              THE COURT:  All right.

3              Now let me turn to Ms. Sessions.

4              MS. SESSIONS:  Thank you, your Honor.

5              I'll take the data first.

6              This new position that they are somehow looking for

7    some data that Inform previously paid Google to retain or

8    provide is -- I frankly don't understand what it is that they

9    are asking for.  So if they want to identify some report or

10   some item of data that they believe that Google previously

11   provided to them that we should have, that's one thing.  That

12   is not what they have asked us to provide.

13             What they have asked us to provide is a completely

14   custom data set that would join up all kinds of data from

15   various transactions akin to what we created at the outset of

16   this case and have provided to all plaintiffs.  And that took

17   months and a bespoke programming pipeline to even try to

18   create.

19             THE COURT:  Well, the good news for everybody, I

20   guess, is Ms. Vash says that's not what she's looking for.  So

21   Ms. Vash has the opportunity to identify to you what

22   ordinary-course-of-business documents she's talking about.  And

23   I'm going to deny the requests for transaction level data

24   without prejudice to Inform doing that.  They reserve the right

25   to come back to me if they're successful in showing that --

1    well, actually, they won't need to.  Because if they are

2    successful in showing it and you have it, you're going to

3    produce it.

4              MS. SESSIONS:  Understood, your Honor.

5              THE COURT:  Correct?

6              MS. SESSIONS:  Yes.

7              THE COURT:  Okay.

8              Now, as to the deposition, it seems to me the request

9    is reasonable.  Inform is late to the party.  And I understand

10   the point that it could have been done sooner, but I'm going to

11   allow it.  And again, it can take place, but no later than the

12   14-day bulge period.  We'll call it the bulge period.  I'm not

13   calling it an extension.

14             MS. SESSIONS:  Understood, your Honor.

15             THE COURT:  All right.

16             MS. VASH:  Thank you, Judge.

17             THE COURT:  Now I ask again, anything else?

18             MR. KOROLOGOS:  No, your Honor.

19             MS. VASH:  Nothing further, Judge.  Thank you.

20             MR. STINER:  Nothing for advertisers, your Honor.

21             MR. GOODNOW:  Your Honor, I've got two small points

22   for Daily Mail and Gannett, if you don't mind.

23             THE COURT:  Sure.

24             MR. GOODNOW:  The last -- excuse me, a couple of

25   months Daily Mail and Gannett has sent a source code expert to

O6KVGOOC

1     go review the source code at Axinn's offices here in New York.

2     And we've made a request for a piece of Python program software

3     to be downloaded onto the source code computer.  I understand

4     it's something that is free and you just download online.  And,

5     in fact, we sent them the link.  We've asked three times for it

6     and we haven't gotten a response yet.  With fact discovery

7     closing next week and our expert is going to be in New York for

8     the bulk of next week, the 25th to the 28th, we're hoping to

9     get the software on the computer so he can use it to read the

10    source code.

11              THE COURT:  Well, you'll get a response by 5 p.m.

12    tomorrow.

13              MR. GOODNOW:  Thank you, your Honor.

14              THE COURT:  Thank you.

15              Anything from the defendants?

16              MS. SESSIONS:  Just a flag, your Honor, because I'd be

17    remiss if I didn't mention it while we're in front of you.

18              We have potentially one or two issues relating to

19    scheduling remaining depositions of the plaintiffs in this

20    case.  And there's at least one plaintiff who has indicated

21    that they are unavailable during the fact discovery period and

22    for some time after that.  So we may be coming back to your

23    Honor with a limited request to take that deposition beyond

24    your Honor's fact discovery cutoff.

25              But nothing for your Honor to resolve now.

O6KVGOOC

1          THE COURT:  Placeholder more than anything else.

2          MS. SESSIONS:  Correct.

3          THE COURT:  Okay.

4          Anything else from anybody?

5          MR. GOODNOW:  Your Honor, I mentioned two points.

6     Then I made the first and got over eager and sat down.

7          Two months ago Google did agree to produce log level

8     data to Daily Mail.

9          THE COURT:  What?

10          MR. GOODNOW:  Sorry, your Honor.  The microphone is

11     away from me.

12          THE COURT:  Produce?

13          MR. GOODNOW:  To produce transaction level data to

14     Daily Mail and Gannett.  So we have an agreement to that.  My

15     understanding is is that they are going to make the production

16     of data by the end of fact discovery.

17          We have one outstanding question we've raised to

18     Google, which is whether they're going to define certain of the

19     transaction level fields that have not yet been defined in the

20     case.  Google's defined a number of terms, but we think they

21     are making a production of certain others that haven't been

22     defined.  So we're hoping just to get an answer from them

23     whether they are willing to define those terms.  They've told

24     us they'd be willing to define a reasonable number, but I

25     haven't actually gotten an answer yet on that question.

1          THE COURT:  Talk.  Talk to each other.

2          MR. GOODNOW:  We have an outstanding request and I

3    haven't heard back.

4          THE COURT:  Excuse me?

5          MR. GOODNOW:  I said, your Honor, we have an

6    outstanding request and I haven't heard back.  I'd be happy to

7    get back in touch with them if that's what you'd like me to do.

8          THE COURT:  Ms. Sessions, you're going to see that a

9    response is given to this request?

10          MS. SESSIONS:  Yes, your Honor.

11          MR. GOODNOW:  Thank you, your Honor.

12          THE COURT:  Well, I hope that I don't see you until

13    after the bulge.  And therefore, I take this occasion to wish

14    you all a very happy Independence Day and to congratulate you

15    prematurely on possibly getting to the finish line on fact

16    discovery.

17          And please do not take this the wrong way.  I will be

18    thinking about you, but I hope I don't hear from you except

19    with good news of joy and agreement.

20          We are adjourned.

21                              *    *    *

22

23

24

25